IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

BRIAN XIONG,

                          Plaintiff,                       OPINION AND ORDER

    v.

                                                               20-cv-242-wmc

BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,

                          Defendant.

Plaintiff Brian Xiong alleges that, his former employer, the University of Wisconsin-Oshkosh ("UW-Oshkosh"), discriminated against him on the basis of his race and national origin, as well as retaliated against him when he complained about race discrimination against him and others, both in violation of Title VII, 42 U.S.C. § 12132, *et seq*. Before the court is defendant's motion for summary judgment on plaintiff's claims. (Dkt. #27.) Because plaintiff has failed to proffer sufficient evidence from which a reasonable jury could find discrimination or retaliation, the court will grant defendant's motion and enter judgment in its favor.

UNDISPUTED FACTS[1]

**A.  Plaintiff's Employment**

Plaintiff Brian Xiong, a Hmong Asian-American, was hired by defendant UW-Oshkosh as a Director of Affirmative Action in October 2018, replacing Ameerah McBride,

---

[1] Viewing the evidence of record in the light most favorable to plaintiff as the non-moving party, the following facts are material and undisputed for purposes of summary judgment, except where noted.

the former director, who had resigned in April 2018.  After McBride's resignation, UW-Oshkosh changed the structure of the position.  The new structure required that the hired employee report directly to the Associate Vice Chancellor ("AVC") of Human Resources, Shawna Kuether, instead of directly to the Chancellor as was the case with McBride.  The requisition information form for the position stated, "[t]he previous position was hired as a Special Assistant to the Chancellor.  The Director title would be hired at a lower salary." (Def.'s PFOFs (dkt. #29) ¶ 28).)

The parties dispute the extent to which the job responsibilities as Director differed from those of the Special Assistant, but defendant represents that the new position also had reduced responsibilities consistent with the lower salary.  (Def.'s Br. (dkt. #28) 3.) For his part, plaintiff contends that "the job descriptions read identically except that the former reports directly to the Chancellor and is expected to be actively involved in professional development networking responsibilities."  (Pl.'s Opp'n (dkt. #40) 6.) Regardless, UW-Oshkosh held a nationwide search and extended a job offer to plaintiff with a salary of $80,000 per year, which was raised to $85,000 per year to offset moving expenses.  Jim Fletcher, Vice Chancellor of Finance and Administration, served as the hiring manager for this search.

### B.  Plaintiff's Work Performance

Plaintiff started his job at UW-Oshkosh on October 8, 2018.  Shortly after, Xiong's direct supervisor, Shawna Kuether, found him to be insubordinate.  Specifically, Kuether felt that Xiong did not respect her as a supervisor, committed her to doing a presentation without her knowledge, and made comments about her limited qualifications.  (Def.'s

PFOFs (dkt. #29) ¶¶ 47-48.)  Plaintiff purports to dispute these facts but provides no support for his contrary view in the form of an affidavit or otherwise.  (Pl.'s Resp. to Def.'s PFOFs (dkt. #41) ¶¶ 47-48.)  Kuether also contends that on October 29, 2018, plaintiff mispresented the advice he purportedly received from UW-Oshkosh's legal counsel regarding another employee's discrimination complaint.  Here, too, plaintiff purports to dispute this fact, denying having any conversations with UW-Oshkosh's legal counsel in October 2018, but again provides no support for his account.  (*Id.* ¶¶ 50-56.)

Finally, shortly after his employment began, Xiong completed and submitted his first investigatory report regarding an employee's discrimination complaint.  Xiong's supervisor Kuether avers that Xiong did so with seeking her advice or input, and both the Chancellor's Chief of Staff, Kathleen McQuillan, and she found the quality of Xiong's report to be unsatisfactory, lacking sufficient analysis and containing numerous grammatical errors.[2]  In response, UW-Oshkosh's Office of General Counsel held a training session on investigations and report writing to specifically address the poor quality of Xiong's investigatory report.  (Def.'s PFOFs (dkt. #29) ¶ 59.)  However, Xiong disputes that the training on investigations and report writing was held to address concerns about the quality of *his* report; rather, he contends the session was a regularly-conducted training

---

[2] In reply in support of defendant's motion for summary judgment, Kuether submits a declaration and hand-written notes from a conversation she purportedly had with Xiong about writing investigatory reports.  (Kuether Decl. (dkt. #52); Ex. 125 (dkt. #53).)  Plaintiff moves to strike it on the basis that it was not disclosed in response to interrogatories.  (Dkt. #55.)  Regardless of the merits of plaintiff's motion, these facts and Exhibit 125 are not material to defendant's motion or serve as a basis for the court granting summary judgment.  As such, the motion to strike is denied as unnecessary.

offered by the UW System to employees in similar positions.  (Pl.'s Resp. to Def.'s PFOFs (dkt. #41) ¶ 59.)

### C.  Plaintiff's Complaints

On January 17, 2019, in anticipation of drafting performance evaluations for all of her subordinates, including Xiong, Kuether emailed her staff, asking each to respond to three questions:  list their accomplishments from the previous year, list their goals for the upcoming year, and include a self-evaluation rating.  In response to this request, Xiong prepared a three-ring binder with 175 pages, including a request for promotion and a pay raise, despite being just five months into his employment.  Xiong also contends that he raised racial discrimination concerns regarding his pay inequity in this self-evaluation, as well as in a later email to Kuether, which included an article about the "bamboo ceiling for Asian Americans," referencing both his own salary inequity and the general lack of promotional opportunities for Asian Americans.  (Def.'s Resp. to Pl.'s PFOFs (dkt. #50) ¶¶ 94-95.)  In contract, Kuether avers that the only time Xiong questioned his low pay was in his self-evaluation.  (*Id*.)

In January 2019, Xiong was the hiring manager for a new open position at the Department of Equity and Affirmative Action.  As hiring manager, Xiong is responsible for creating the position description, identifying a Search & Screen Committee, charging the committee, and making the final decision on the hire.  For the Equity and Affirmative Action position, the Search Committee ultimately chose three applicants to interview:  two white women and one Latina woman, Natasha Aguilera.  Xiong supported Aguilera's hiring because he believed she had a law degree and the most experience in affirmative action.

Xiong also believed Aguilera would contribute to the diversity of the department.  While Kuether was absent during the three interviews due to illness, she received feedback from other staff members who had attended that (1) Aguilera's interview did not go well and (2) another candidate had a stronger background/skillset.  (Def.'s PFOFs (dkt. #29) ¶ 82.)

On March 1, 2019, Kuether met with Xiong to discuss her concerns about this feedback.  In response, Xiong told Kuether that "they are obligated to hire his preferred candidate, Natasha, because of their diversity plan, and that Kuether could not ask whether she was a good fit."  (*Id*. ¶ 88.)  However, Xiong asserts that Kuether actually said that "people of color are not a good fit for Human Resources," which Kuether disputes.  (Pl.'s PFOFs (dkt. #42) ¶ 88 (citing Xiong Decl. (dkt. #43) ¶ 29).)

Later, Kuether emailed Xiong indicating that she would like to meet with the two final candidates before extending an offer.  Xiong responded:

> In my years of working in higher education[,] I haven't had a situation where [] a hiring manager picks the final candidate for the position, and later on turn around by Human Resources outside the normal practice and procedure for additional campus interview to reconsider a White candidate.

(Def.'s PFOFs (dkt. #29) ¶¶ 92-93.)  Kuether replied that she requested to meet the candidates to further investigate her staff's concerns, and it had nothing to do with the candidates' race.  The Department eventually offered Aguilera the position on March 22, 2019.

Xiong met with McQuillan on March 1 and March 5, 2019, to discuss his concerns about Kuether, and he aired several grievances, including Kuether's questioning of his decision to hire his candidate of choice, a Latina woman.  In speaking with McQuillan,

5

Xiong also contends that he mentioned another, race-based discrimination incident in the department involving a former employee, Crawford, who had resigned from the department and reported race-based discrimination in her exit-interview. Not only does defendant dispute this fact (Def.'s Resp. to Pl.'s PFOFs (dkt. #50) ¶¶ 96-97), but McQuillan took handwritten notes during her March 5th meeting with Xiong, which indicate that "Xiong said he cannot work for Kuether, that Kuether is insecure, not confident, is not [a leader], and does not know human resources." (Def.'s PFOFs (dkt. #29) ¶ 73 (quoting McQuillan Decl., Ex. 108 (dkt. #30-8).)[3]

Xiong then emailed Fletcher as the Vice Chancellor of Finance and Administration to advise that: "I am done reporting to [Kuether]. She wants to control but lack[s] leadership, no knowledge of affirmative action/equity, and she is feeling insecure. I either report to you or to the Chancellor, other option is to Dr. Sylvia Carey-Butler." (Def.'s PFOFs (dkt. #29) ¶ 101.) On March 4, 2019, Xiong also met with Fletcher, explaining that he would stop working for UW-Oshkosh if Fletcher did not change the reporting structure of his position, so that he could report either to him or to the Chancellor instead of Kuether. (*Id.* ¶¶ 99, 103, 106.) Xiong also avers that he conveyed Kuether's comment that "people of color are not good fit for HR," although Fletcher disputes this *and* further

---

[3] Plaintiff does not dispute making these statements, but rather objects on the grounds that these handwritten notes are inadmissible hearsay. As a statement of a party opponent, this is not hearsay at all if presented through McQuillan's testimony, even if only used to refresh her recollection. Even if McQuillan were unavailable, her notes would appear to be admissible under the hearsay exception for present sense impression or business record. Federal Rules of Evidence 803(1) and (6). The court need not fully decide this evidentiary issue, however, since this proposed finding of fact is not central to the court's summary judgment decision.

contends that he had never heard Kuether make any disparaging comments based on race, color, or ethnicity.  (Pl.'s Resp. to Def.'s PFOFs (dkt. #41) ¶¶ 104-05.)

### D. Plaintiff's Termination

In response to this ultimatum, Fletcher met with UW-Oshkosh Chancellor Andrew Leavitt and Vice Chancellor Robert Roberts on March 7, 2019, to discuss Xiong's self-described inability to work with Kuether.  They all agreed to terminate Xiong based on his unsatisfactory work performance, continuing disrespect to his supervisor, and insubordination.  However, before doing so, they asked that Fletcher review Kuether's performance evaluation of Xiong.  Kuether had drafted Xiong's performance evaluation in February 2019, noting his poor work product and rating his overall work as unsatisfactory.  (Def.'s PFOFs (dkt. #29) ¶¶ 57-58, 63-69.)   Still, Kuether had not yet shared this performance evaluation with Xiong.

After  confirming that Kuether's performance evaluation further supported his decision to terminate on March 12, 2019, Fletcher then terminated Xiong *without* first offering a performance improvement plan, which is "not typically how [UW-Oshkosh does] business in terms of performance concerns."  (Pl.'s PFOFs (dkt. #42) ¶ 115 (citing Kuether Dep. (dkt. #37) 114).)

### E. Hiring a Successor

Following Xiong's termination, UW-Oshkosh reposted his position with the same structure.  Specifically, the new hire again would report to Kuether and receive the same advertised salary.  In August 2019, UW-Oshkosh hired Sean Fay, a white man, as the next

Director of EEO/AA.  Plaintiff contends that UW-Oshkosh provided Fay with support that he had never received during his employment.  (Def.'s Resp. to Pl.'s PFOFs (dkt. #50) ¶ 121.)  Specifically, Xiong points to the fact that Fay drafted his first investigatory report by collaborating with an attorney at UW-Oshkosh.  (*Id.*)  Defendant disputes this as well, asserting that UW-Oshkosh offered plaintiff similar support to Fay by providing orientation to the investigative process, informing him about templates and prior investigative reports, offering access to templates and prior reports, *and* providing him with a training on investigations and report writing after he wrote his first investigative report. (*Id.*)

OPINION

Defendant seeks summary judgment based on plaintiff's failure to establish "sufficient evidence to support a jury verdict that his termination was a result of intentional discrimination" based on his race and national origin *or* due to retaliation for opposing unlawful discrimination.  *David v. Bd. of Tr. of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017).  Summary judgment is appropriate where the moving party establishes that (1) "there is no genuine dispute as to any material fact," and (2) it "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To survive summary judgment, "inferences relying on mere speculation or conjecture will not suffice"; rather, a nonmoving party with the burden of proof "must point to specific facts showing that there is a genuine issue for trial."  *Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 407 (7th Cir. 2009).

When asserting a discrimination claim on the basis of race in violation of Title VII in particular, a plaintiff must "produce enough evidence . . . to permit the trier of fact to

find that his employer took an adverse action against him because of his race." *Morgan v. SVT, LLC*, 724 F.3d 990, 997 (7th Cir. 2013). Certainly, the court is able to conclude as a matter of law that *no* reasonable jury could so find for the reasons discussed below.

## I. Discrimination

Under Title VII, plaintiff contends that his employer, defendant UW-Oshkosh, committed race discrimination based on his being Asian and Hmong. Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In discrimination cases, "[w]hen a defendant moves for summary judgment, the 'singular question' for the district court is whether the plaintiff has introduced evidence that would 'permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894 (7th Cir. 2018).

While a plaintiff may offer direct or circumstantial evidence of discrimination, "all evidence belongs in a single pile and must be evaluated as a whole." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Still, the "familiar" burden-shifting framework of *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), allows "a plaintiff to make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext." *Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020), *reh'g denied* (July 31, 2020). To establish a

prima facie case, a plaintiff must show: (1) he belongs to a protected class; (2) he met his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another, similarly-situated employee outside of his protected class received better treatment from his employer. *Marshall v. Ind. Dep't of Corr.*, 973 F.3d 789, 791–92 (7th Cir. 2020).

Plaintiff's racial discrimination claim fails under the *McDonell Douglas* framework for multiple reasons. As an initial matter, plaintiff has not raised a genuine dispute of material fact concerning his failure to meet UW-Oshkosh's legitimate expectations. The evidence of Xiong's performance reviews by his supervisor, Kuether, in addition to McQuillan's statements about Xiong's work product, shows that plaintiff's performance was at best lackluster, and at worst, unacceptable. As Xiong contends, performance reviews are not indisputable. Even so, "[t]he question is not whether the ratings were right but whether the employer's description of its reasons is honest." *Gustovich v. AT & T Commc'ns, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) (*per curiam*). Other than disagreeing with Kuether's and McQuillan's evaluation of his first investigatory report's quality, prepared shortly after starting his job, Xiong has offered no evidence of dishonesty. Moreover, disagreement with a review "does not mean that the evaluations were the result of unlawful discrimination." *Dickerson v. Bd. of Trustees of Cmty. Coll. Dist.* No. 522, 657 F.3d 595, 603 (7th Cir. 2011). Similarly, Xiong's *self*-evaluation of his report does not translate into a prima facie case under the *McDonell Douglas* framework without offering proof or motivation for Kuether's or McQuillan's dishonesty at this point.

10

Regardless, Xiong did not identify a similarly situated employee who received better treatment. Certainly, a comparator need not be identically positioned, but alleged, "similarly situated employees must be 'directly comparable' to the plaintiff 'in all material respects.'" *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 365–66 (7th Cir. 2009) (quoting *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610–11 (7th Cir. 2006)). "Whether a comparator is similarly situated is typically a question for the fact finder, unless, of course, the plaintiff has no evidence from which a reasonable fact finder could conclude that the plaintiff met his burden on this issue." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 895 (7th Cir. 2018).

Here, Xiong presented his successor, Sean Fay, as a comparator, but offered no evidence that Fay was similarly situated in all material respects, yet was treated more favorably. In particular, plaintiff offers no evidence that UW-Oshkosh maintained Fay's employment despite his (1) performing poorly in his position; (2) earning an unsatisfactory evaluation; (3) supervisors perceiving him as insubordinate; or (4) airing his dissatisfaction with his supervisor. Moreover, the only evidence Xiong offers to show "better treatment" is that UW-Oshkosh changed some policies to allow the EEO/AA department director to consult with legal staff when drafting an investigatory report. Unfortunately for plaintiff, this evidence is not enough to allow a reasonable jury to draw a distinction between Fay's situation and his. More critically, Xiong neither presents evidence nor otherwise argues that his treatment while drafting his first investigatory report was a discriminatory act. If anything, the evidence is to the contrary, since there is no dispute that UW-Oshkosh offered plaintiff training, orientation and other resources that he could have relied on while

drafting his report.  Additionally, the decision to terminate Xiong was not merely based on a single, poor investigative report; rather, his continuing disrespect to his supervisor, insubordination, self-described inability to work with his supervisor, and finally an ultimatum within the first six months of employment to his boss's boss that (effectively) "it is my way or the highway."  For all these reasons, Xiong failed to establish a prima facie case for discrimination based on his race and origin under the *McDonell Douglas* framework.

Even stepping back from that framework, Xiong's claim falls short under the broader question articulated in *Ortiz* eschewing any framework or formula, "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action."  834 F.3d at 765.  Principally, Xiong points to defendant's failure to share any performance evaluation with him or to offer a performance improvement plan before his termination as probative of race discrimination.  While the court recognizes that a reasonable trier of fact might find that defendant acted hastily, such disparate treatment is not enough to show that his Asian ethnicity or Hmong origin factored into its quick termination decision, especially since it is an undisputed fact that Xiong declared his intention to resign if UW-Oshkosh did not *immediately* restructure his position and change his supervisor.

Although not relied on by plaintiff in opposing defendant's motion for summary judgment on plaintiff's discrimination claim, the court is troubled by plaintiff's assertion that Kuether told him, "people of color are not a good fit for Human Resources" in reference to another prospective employee.  Still, plaintiff's lack of reliance on this

statement to demonstrate the necessary causal nexus between his termination and racial or ethnic discriminatory intent is understandable, since the undisputed record reflects that Kuether was *not* one of the individuals who decided to terminate Xiong's employment.  Nor does plaintiff pursue any argument that Kuether orchestrated the termination by her superiors.  *See Staub v. Proctor Hosp*., 562 U.S. 411, 421 (2011) (discussing a cat's paw theory).  To the contrary, plaintiff actually relies on *Kuether's* apparent surprise that Xiong was fired without being offered a performance improvement plan as a basis to question her supervisor's decision to terminate Xiong's employment.  (Kuether Dep. (dkt. #37) 114.)

Although not argued by plaintiff, the court recognizes that the actual decisionmakers may have accepted Kuether's view of Xiong's insubordination and quality of performance, as well as her assertion that she never made the racist comment attributed to her (although Fletcher, as the principal decisionmaker, also denies that Xiong told him about that comment).  Even accepting this, however, the decisionmaker's reliance on information from Kuether is *not* evidence of racial animus *on the part of the decisionmakers*, particularly in light of the undisputed evidence of Xiong's aggressive email to and in-person meeting with Fletcher that ended with his hard line ultimatum.[4]  Regardless, Kuether's alleged racist comment does not permit a reasonable inference that the three decisionmakers here were motivated by racial or ethnic animus in terminating Xiong; and critically, plaintiff fails to propose any facts or develop any argument in his brief to support

---

[4] The court notes that in the email Xiong sent to Fletcher, his complaint was *not* about having to report to a racist, but rather he complained about having to report to someone who "lack[s] leadership, no knowledge of affirmative action/equity, and [feels] insecure."  (Def.'s PFOFs (dkt. #29) ¶ 101.)

such an inference. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995) ("[J]ust as a district court is not required to scour the record looking for factual disputes, it is not required to scour the party's various submissions to piece together appropriate arguments." (internal citation and quotation marks omitted)).

Accordingly, the court concludes that plaintiff has not put forth sufficient evidence from which a reasonable jury could conclude that Xiong's race or national origin played a material role in his termination. As such, the court will grant defendant's motion as to this claim.

## II. Retaliation

Xiong also asserts a retaliation claim against defendant under Title VII. Like discrimination, retaliation may be established by either the direct or indirect methods of proof. *Weber v. Universities Research Ass'n*, 621 F.3d 589, 592 (7th Cir. 2010). In his opposition to the summary judgment motion, Xiong expressly relies on the direct method of proof. To establish retaliation under this method, Xiong must show that: (1) he engaged in activity protected by Title VII; (2) UW-Oshkosh took an adverse employment action against him; and (3) there was a "but-for" causal connection between his protected activity and the adverse employment action. *Leitgen v. Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 673 (7th Cir. 2011). The second element is not disputed. Nevertheless, the parties dispute whether Xiong engaged in any activity protected by Title VII, and whether he has evidence supporting an inference that his protected activity was the but-cause link for UW-Oshkosh's adverse actions.

14

An employee engages in a protected activity by either: (1) filing a charge, testifying, assisting or participating in any manner in an investigation, proceeding or hearing under Title VII or other employment statutes; or (2) opposing an unlawful employment practice. *Andonissamy v. Hewlett–Packard Co.*, 547 F.3d 841, 850–51 (7th Cir. 2008). Vague and obscure "complaints" do not constitute protected activity. *Id*. Xiong argues that he engaged in protected activities under Title VII by raising several concerns regarding discrimination in the workplace. First, he represents reporting to Fletcher that "Kuether was not properly dedicated to, or informed about AA/EEO, leading her to make poor policy choices." (Pl.'s Opp'n (dkt. #40) 39.) These complaints about Kuether's qualifications and alleged poor management, however, do not constitute protected activity under Title VII, or at least a reasonable jury could not so find. Rather, these comments confirm Xiong's personal and professional conflict with Kuether.

Second, Xiong maintains his complaint about Kuether's involvement in the job recruitment constituted a protected activity, as did her "attempt[ing] to override his decision to hire a Latina candidate over a white candidate." (*Id*.) While his comments at the time of the hiring decision may constitute complaints about race discrimination, any retaliation based on these statements still falls short absent evidence from which a reasonable jury could conclude that his objection instigated the adverse employment action. Other than his belief, nothing in this record indicates that Kuether was motivated by anything than her professional duty to interview the candidates, especially since she missed earlier interviews for being sick, received mixed feedback from the other interviewers, and recognized the stronger background of the other candidate. In fact, Xiong

does not dispute the fact that Kuether was not involved in his termination decision, and that she was even surprised by his apparent decision to exclude her.  Finally, there is also no dispute that the department ultimately offered the job to the Latina woman.

Third, Xiong claims to have filed a "Concern Form," complaining about a policy change regarding AA/EEO compliance.  (Xiong Decl., Ex. C (dkt #43-3).)  While Xiong attaches the form to his declaration, he does not indicate to whom he submitted the form -- one that he had apparently created for that purpose -- and more specifically, he provides no basis for finding that this form was received by one of the three individuals who actually terminated his employment.  Summary judgment is the "proverbial 'put up or shut up' moment," at which point a party needs to present evidence that would permit a rational trier of fact to find in his favor.  *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 973 (7th Cir. 2020).  Xiong falls short of making such a showing with respect to this isolated form.

 Finally, Xiong claims to have engaged in protected activity by raising concerns in his self-evaluation report about pay discrepancy he attributed to his race and in sending an email to Kuether about the "bamboo ceiling for Asian Americans."  Xiong does not discuss pretext in the context of any Title VII unequal pay claim, and only argues that his requests for a pay raise were ignored.  Moreover, Xiong does not claim that Kuether followed up on those requests in any way.  While the court is skeptical that these complaints are protected under Title VII, in light of the undisputed record surrounding the reasons for Xiong's compensation, as compared to his predecessor, Xiong fails to point to any evidence linking these complaints to the ultimate termination decision.  As described above, Kuether was not involved in the termination decision.

The critical question, then, is whether Xiong's comments directly to Fletcher, as the key individual who terminated his employment, would permit a reasonable jury to find that he terminated Xiong because of his complaint about Kuether's alleged discriminatory acts.  A causal link requires more than the mere fact that an employer's action happens after an employee's protected activity. *Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016). As explained above, the record establishes beyond reasonable dispute that Xiong had a significant history of performance problems -- most notably, insubordination and presenting his boss's boss with an ultimatum.  Absent other evidence of retaliation, even his claimed statements to Fletcher regarding Kuether's discriminatory comment, or that she was obstructing hiring a Latina woman, do not create genuine issues for trial. *See Geier v. Medtronic, Inc.*, 99 F.3d 238, 242 (7th Cir.1996) ("To be probative of discrimination, isolated comments must be contemporaneous with the discharge or causally related to the discharge decision making process.").

When there are reasonable, non-suspicious explanations for the timing of the defendant's conduct, proximity in time is not enough to support a retaliation claim. *Terry v. Gary Cmty. Sch. Corp.*, 910 F.3d 1000, 1008 (7th Cir. 2018).  The undisputed evidence of documented performance problems, insubordination and, critically, Xiong's ultimatum persuades us that a reasonable jury could not find that he was terminated *because of* his complaints about race discrimination.

17

ORDER

IT IS ORDERED that:

1) Defendant Board of Regents of the University of Wisconsin System's motion for summary judgment (dkt. #27) is GRANTED.

2) Plaintiff Brian Xiong's motion to strike (dkt. #55) is DENIED as unnecessary.

3) The telephonic scheduling conference set for January 24, 2022, is CANCELED.

4) The clerk of court is directed to enter judgment in defendant's favor and close this case.

Entered this 21st of January, 2022.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge