CERTIFIED COPY
A True Copy
Teste:

_____
Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 22-1271

BRIAN XIONG,

                           *Plaintiff-Appellant*,

v.

BOARD OF REGENTS OF THE UNIVERSITY OF WISCONSIN SYSTEM,

                           *Defendant-Appellee*.

_____

Appeal from the United States District Court for the
Western District of Wisconsin.
No. 3:20-cv-242 — **William M. Conley**, *Judge*.

_____

ARGUED JANUARY 10, 2023 — DECIDED MARCH 9, 2023

_____

Before SCUDDER, KIRSCH, and JACKSON-AKIWUMI, *Circuit Judges*.

SCUDDER, *Circuit Judge*. After butting heads with his boss for months, Brian Xiong demanded change: he wanted a new supervisor or he would stop working. The University of Wisconsin Oshkosh responded by firing him. If that was all, Xiong's lawsuit would be rightfully dismissed at summary judgment. But alongside leveling his demand, Xiong also reported to the University that his boss and the human

Case: 3:20-cv-00242-wmc Document #: 77-1 Filed: 03/31/23 Page 2 of 14
Case: 22-1271 Document: 00714171159 Filed: 03/31/2023 Pages: 14

2 No. 22-1271

resources department were violating Title VII in their hiring and promotion practices. Because the University chose to fire him just one day after this whistleblowing, a reasonable jury could infer that his termination was retaliatory. Employers often have mixed motives for taking adverse actions against employees, and the existence of both prohibited and permissible justifications reserves the question for a jury to resolve. Xiong may win at trial, or he may lose. Our conclusion is limited to saying he has shown enough to permit a jury to find that his termination would not have happened absent his complaint about Title VII violations. We therefore affirm in part and reverse in part.

I

A

Xiong is Hmong and speaks English as a second language. He joined the University of Wisconsin Oshkosh as its Director of Affirmative Action in October 2018. This position entailed ensuring that the campus complied with the University's affirmative action plan and developing policies consistent with that plan. Xiong reported to Shawna Kuether, Associate Vice Chancellor of Human Resources, but the relationship between them soon soured.

In December 2018, for example, and in response to an account of race discrimination, Xiong drafted an investigation report that Kuether found to be of poor quality. Two months later, in February 2019, Xiong gave Kuether a 175-page self-assessment as part of his annual performance review in which he claimed he was being paid less because he is Hmong and Asian. Kuether then canceled his review meeting, declined to reschedule it despite Xiong's follow-up efforts, and did not

share the final written performance review with him until the University fired him. Experiences like these led to Xiong's impression that Kuether specifically and the HR department more generally supported neither him nor the University's broader diversity goals.

The tension between Xiong and Kuether came to a head in February and March 2019, when Xiong attempted to hire a new training and compliance officer to work under him. The search committee interviewed two white women and one Latina woman, Natasha Aguilera. Xiong, who had final say on who to hire, selected Aguilera because she had a law degree and would add diversity to the HR department, which was primarily white.

But Kuether questioned Xiong's judgment. On March 1, she emailed him to slow the hiring process because she had heard concerns about Aguilera from others who had interviewed her. This prompted an in-person meeting on March 4 between Xiong and Kuether, the recollections of which contradict each other. Xiong recalls Kuether saying "people of color are not a good fit" for human resources. Kuether denies ever saying anything like that.

A flurry of emails followed this meeting. Kuether first requested that Xiong schedule follow-up interviews with the candidates for the new training and compliance position. Xiong responded by copying James Fletcher, the Vice Chancellor of Finance and Administration and Kuether's boss, and insinuating that race was the motivating factor for Kuether questioning Xiong's selection of Aguilera. In a separate email to Fletcher the next day, Xiong demanded that he no longer report to Kuether.

Case: 3:20-cv-00242-wmc   Document #: 77-1   Filed: 03/31/23   Page 4 of 14
Case: 22-1271      Document: 00714171159      Filed: 03/31/2023     Pages: 14

4                                                                 No. 22-1271

On March 6, Xiong and Fletcher met to discuss the hiring situation and Xiong's demand for a change in reporting structure. Xiong shared what Kuether had allegedly said about people of color not being a good fit in HR, though Fletcher denies ever hearing about that specific comment. Xiong says he also raised broader concerns about the HR department's hiring and promotion policies, expressing the view that the University could face legal liability. In response to all this, Fletcher recalls saying that he hoped that Xiong and Kuether could work out their problems.

The next day, March 7, Fletcher met with three other University leaders, including the Chancellor and an attorney in the general counsel's office. Fletcher stated that he had decided to fire Xiong, subject to a review of any positive information in Kuether's written performance review. After confirming he was not missing anything, Fletcher terminated Xiong on March 12. He explained that he made the decision due both to Xiong's insubordination and his poor work performance.

Xiong sued the University a year later, alleging counts of discrimination and retaliation under Title VII.

B

The district court entered summary judgment for the University on both of Xiong's claims. The district court started with Xiong's Title VII discrimination claim and concluded that he failed to establish a prima facie case under the *McDonnell Douglas* framework. See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). And so too, the district court continued, did Xiong fail to point to evidence supporting his contention that his Hmong ethnicity drove his termination. The district

No. 22-1271 5

court saw all of this as precluding a jury from finding prohibited discrimination.

Xiong's retaliation claim fared no better. The district court recognized that he had premised his claim on activity that Title VII protects—his complaints about his own pay and Kuether's involvement in the hiring process of Aguilera—but Xiong had not identified evidence connecting that activity to the University's decision to fire him.

Xiong now appeals both rulings.

## II

We review the grant of summary judgment to the University against a clean slate, drawing all reasonable inferences from the record in favor of Xiong as the non-movant. See *Groves v. South Bend Cmty. Sch. Corp.*, 51 F.4th 766, 769 (7th Cir. 2022). We first address Xiong's discrimination claim and then his retaliation claim.

### A

Although no longer required, Xiong invoked the *McDonnell Douglas* burden-shifting framework to prove his Title VII discrimination claim. See *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). Under this framework, once a plaintiff sets forth an initial case of discrimination, the burden then shifts to the defendant to identify a nondiscriminatory justification for the adverse action. See *Groves*, 51 F.4th at 770. After the defendant proffers that justification, the plaintiff must prove that the nondiscriminatory reason was pretext for discrimination. See *id.*

The pretext inquiry is dispositive here because Xiong has forfeited the contentions he presses on appeal. For his

discrimination claim to reach a jury, Xiong had to identify evidence indicating that the statutorily protected factor—his Hmong ethnicity—caused his termination, notwithstanding the University's explanation that he engaged in insubordination (by demanding a new supervisor) and failing to meet performance expectations.

Xiong's arguments on appeal are night and day compared to what he presented to the district court. In the court below, Xiong made the all-too-common mistake of arguing that the University's nondiscriminatory reason was pretextual without ever explaining why it was a pretext for discrimination due to him being Hmong. See, *e.g.*, *Chatman v. Bd. of Educ.*, 5 F.4th 738, 747 (7th Cir. 2021) (discussing how the plaintiff failed to demonstrate that "discriminatory animus" drove the adverse employment action); *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 840 (7th Cir. 2014) (explaining that the plaintiff failed to present evidence addressing "the fundamental question" of "whether a reasonable jury could find prohibited discrimination"). Put differently, Xiong asserted that the University was lying but stopped short of taking the added, necessary step of pointing to evidence that the purported lie masked a proscribed reason for him being fired. As the district court rightfully concluded, that contention does not suffice to reach a jury.

In his appellate briefs, Xiong expands his pretext analysis to encompass specific examples from which a jury might infer that his Hmong ethnicity motivated his termination. By way of example, he contends that in critiquing his work product, Kuether penalized him for speaking English as a second language and otherwise stereotyped him as an Asian. But that contention should have been presented to the district court in

Case: 3:20-cv-00242-wmc   Document #: 77-1   Filed: 03/31/23   Page 7 of 14
Case: 22-1271   Document: 00714171159   Filed: 03/31/2023   Pages: 14

No. 22-1271                                                                7

the first instance. Although we can accept a "new twist" on an argument advanced in the district court, *United States v. Billups*, 536 F.3d 574, 578 (7th Cir. 2008), a litigant cannot raise entirely new arguments on appeal. See *Flynn v. FCA US LLC*, 39 F.4th 946, 953 (7th Cir. 2022) ("Our task is to review the district court's decision as the issue was presented by the litigants.").

We agree with the University that Xiong has forfeited these arguments. The district court properly entered summary judgment for the University on Xiong's discrimination claim.

B

That brings us to Xiong's retaliation claim. To establish retaliation under Title VII, Xiong must show that he engaged in a statutorily protected activity, he suffered a materially adverse employment action, and there was a causal connection between the two. See *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022). All agree that Xiong's termination qualifies as a materially adverse employment action.

The strongest basis for Xiong's retaliation claim stems from what he reported to Fletcher on March 6. Recall the sequence of events preceding Xiong's termination. On March 4, Kuether allegedly told Xiong that "people of color are not a good fit" when the two met to discuss hiring someone into the new training and compliance officer position. Xiong then met with Fletcher two days later after expressing concerns over email about whether race prompted Kuether's intervention. It was at this March 6 meeting that Xiong shared what Kuether had purportedly said, voiced his concerns about the HR department's discriminatory hiring and promotion practices,

and reported that all of this could give rise to legal liability. These comments amount to Xiong complaining about discrimination on the basis of race. As the district court rightfully concluded, the statements qualify as statutorily protected activity. See *Miller v. Chicago Transit Auth.*, 20 F.4th 1148, 1155 (7th Cir. 2021).

Where we part ways with the district court is on the issue of causation. Fletcher made the tentative decision to fire Xiong on March 7, just one day after Xiong met with Fletcher and voiced concerns about unlawful discrimination and Title VII liability. This close temporal proximity alone can give rise to a finding of causation. To be sure, we have "rejected any bright-line rule about how close the events must be to establish causation." *Castro v. DeVry Univ., Inc.*, 786 F.3d 559, 565 (7th Cir. 2015). But here we have little trouble concluding that a jury could infer causation when merely one day passes between the protected activity and the adverse employment action. See *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012) (permitting an inference of causation on the sole basis of temporal proximity when the timing is "no more than a few days" because "the closer two events are, the more likely that the first caused the second"). Such a compact timeline suffices as one of the instances where the timing is tight enough to support an inference of causation.

It is also of no consequence, at least at summary judgment, that Xiong reiterated his demands for a new supervisor to Fletcher during the same March 6 meeting. Title VII demands "but-for causation" between the protected activity and the retaliation. *Lesiv*, 39 F.4th at 918. But that standard, as case law explains, "does not mean that the protected activity must have been the *only* cause of the adverse action. Rather, it

Case: 3:20-cv-00242-wmc   Document #: 77-1   Filed: 03/31/23   Page 9 of 14
Case: 22-1271   Document: 00714171159   Filed: 03/31/2023   Pages: 14

No. 22-1271                                                                 9

means that the adverse action would not have happened *without the activity.*" *Id.* (emphasis added) (quoting *Carlson v. CSX Trans., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014)). If an adverse employment action is the result of two different causes—one prohibited by Title VII and the other permissible—then summary judgment should not be granted to an employer. See *Malin v. Hospira, Inc.*, 762 F.3d 552, 562 n.3 (7th Cir. 2014) (explaining that a "single event can have multiple but-for causes").

That is the situation here, especially when viewing the record in the light most favorable to Xiong as Rule 56 requires. A jury could find that Fletcher decided to fire Xiong because of insubordination *and* his complaints about Kuether's comments. It is up to the jury, not a court at summary judgment, to unravel the competing, and perhaps intertwined, narratives as to why Fletcher decided to take that action. See *Castro*, 786 F.3d at 569 ("Employers cannot retaliate against employees who complain about violations of Title VII under the ruse that the employee was being 'disloyal' or 'insubordinate' by opposing the unlawful activity.").

The facts before us also do not present a situation where the nondiscriminatory reason so overwhelms that no reasonable jury could infer the protected activity was the but-for cause. See *Malin*, 762 F.3d at 562 n.3 (specifying that a jury must be able to conclude that both but-for causes have merit to avoid summary judgment). Viewing the evidence in the light most favorable to Xiong, his purported insubordination does not cross that line. The demand to change his reporting structure, though perhaps ill-advised and reflecting insubordination, is a common request for a disgruntled employee. To the extent that this ultimatum may have drove Fletcher's

termination decision, Xiong has raised a genuine dispute of material fact on the issue such that a jury should decide causation in the first instance. Whether he is able to prevail at trial, however, is an altogether different question—one we leave to a jury to resolve.

C

We conclude by constraining the scope of this claim on remand. Beyond the protected activity of complaining about race discrimination in connection with the HR department, Xiong has also identified his own pay disparity complaint as an alternative theory underpinning his retaliation claim. This theory of liability is not viable on the summary judgment record before us.

Xiong raised his pay disparity complaint only with Kuether, not Fletcher, and we see no evidence that Fletcher was even aware of this complaint on March 7 when he met with fellow University leaders and made the decision to fire Xiong subject to checking Kuether's written performance evaluation. See *Lesiv*, 39 F.4th at 915 ("Knowledge of the protected activity is necessary to show causation for a retaliation claim."). Nor could a reasonable jury infer that Fletcher's subsequent meeting with Kuether provides the basis for causation because the University had already reached its decision to fire Xiong beforehand. As Xiong admits, Fletcher only conferred with Kuether and checked Xiong's performance review to see if there was any positive information he was missing. There was not, so Fletcher held firm to his termination decision from a few days earlier.

What all of this means is that future litigation on the retaliation claim should focus on what motivated Fletcher, as the

No. 22-1271                                                                11

ultimate decision maker for the adverse action, to make the contingent decision to terminate Xiong on March 7.

### III

For these reasons, we AFFIRM in part, REVERSE in part, and REMAND for proceedings consistent with this opinion.

Case: 3:20-cv-00242-wmc   Document #: 77-1   Filed: 03/31/23   Page 12 of 14
Case: 22-1271   Document: 00714171159   Filed: 03/31/2023   Pages: 14

12                                                              No. 22-1271

KIRSCH, *Circuit Judge*, dissenting in part. I agree with the majority's resolution of the discrimination claim. I disagree, however, with its treatment of the retaliation claim. A reasonable jury could not find that the timing of Xiong's termination was suspicious. In my view, the district court properly granted summary judgment to the University, and I would affirm in full.

The majority rests its entire retaliation analysis on temporal proximity. It concludes that Xiong established a prima facie case of retaliation because he complained that his supervisor, Shawna Kuether, made a racist comment the day before the University tentatively decided to fire him. But the majority conflates temporal proximity with suspicious timing. That difference has legal significance. While a plaintiff may survive summary judgment by offering evidence of suspicious timing, temporal proximity alone is insufficient without evidence that makes it suspicious. Even when we can conclude that the timing of the adverse action is suspicious, we have repeatedly cautioned that "suspicious timing will rarely be sufficient in and of itself to create a triable issue" because "suspicious timing may be just that—suspicious—and a suspicion is not enough to get past a motion for summary judgment." *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012).

Xiong was hired in the fall of 2018. From the start, he and Kuether had a poor relationship. He complained that Kuether was unqualified, and he consistently resisted working with her. He insisted that his position be restructured and repeatedly mentioned this to James Fletcher (Kuether's boss). Each time, Fletcher rejected the proposal.

Case: 3:20-cv-00242-wmc Document #: 77-1 Filed: 03/31/23 Page 13 of 14
Case: 22-1271 Document: 00714171159 Filed: 03/31/2023 Pages: 14

No. 22-1271 13

On March 4, 2019, Xiong met with Fletcher and explained that he would no longer report to Kuether. Xiong sent Fletcher a follow-up e-mail with the following demand:

> Dear James – I'm done reporting to Shawna. She wants to control but lack of of [sic] leadership, no knowledge of affirmative action/equity, and she is feeling insecure. … I either report to you or to the Chancellor, other option is to Dr. Sylvia Carey-Butler.

On March 6, Xiong met with Fletcher once more and reissued his ultimatum. Undisputed Material Facts, R. 41 ¶ 106 ("Xiong issued Fletcher the ultimatum that he would not continue working unless he received a new supervisor[.]"). Xiong also reported concerns of Title VII violations in the department's hiring practices and relayed Kuether's comment that people of color were "not a good fit" for human resources. At this point, Xiong fully intended to resign unless the University changed his reporting structure.

The next day, an attorney in the University's general counsel's office convened a meeting with Fletcher, the University of Wisconsin-Oshkosh Chancellor, and a Vice Chancellor. The purpose of this meeting was to discuss ongoing concerns with Xiong's job performance: his unrelenting complaints about the reporting structure, poor quality of his investigative report, lack of focus, and failure to meaningfully participate in a class that was specifically offered to help Xiong improve his skills in investigating and writing reports. For these reasons, the group conditionally decided to terminate Xiong's employment pending a review of his performance evaluation and a discussion with Kuether.

Missing from all of this is any evidence that the timing of Xiong's termination was suspicious, which is why the majority does not say it was. The University decided to fire Xiong two days after he issued his final ultimatum. That is a reasonable explanation disconnected from Xiong's complaint of race discrimination. Xiong had been struggling at his job and, rather than accede to his demand for a different supervisor, the University decided it was best to part ways. Though the majority makes light of the ultimatum, reasoning that it is a common request of unsatisfied employees, no reasonable jury could agree with that view given the record as a whole.

If all the record showed were a complaint of race discrimination and a firing the next day, perhaps a reasonable jury could find that temporal proximity to be suspicious. But at summary judgment, we cannot ignore undisputed material facts. Xiong's ultimatum and his history of insubordination were indisputably central to the University's decision to terminate him. Here, those facts make it such that no reasonable jury could view the timing between Xiong's complaint and his tentative termination as suspicious. I respectfully dissent.